IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE RESIDENCE LOCATED AT 205 HIGH STREET, APARTMENT 1, BERLIN, NH | Case No. __24-mj-267-01-TSM__ <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF <br> AN APPLICATION FOR A SEARCH WARRANT

I, Christopher Anderson, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SA) with the U.S. Department of Homeland Security (DHS),

Homeland Security Investigations (HSI). I am currently assigned to the position of Resident Agent in

Charge (RAC) Derby Line, Vermont. Prior to this position I have been a SA with HSI for over twenty-

one years. Prior to my employment with HSI, I was an Alabama Marine Police Officer for approximately

three and half years. I have extensive experience investigating federal crimes including drug trafficking

offenses and offenses related to firearms, including violations of 18 U.S.C. § 924(c) [possession of a

firearm in furtherance of a drug trafficking crime].

2.      I am an investigative or law enforcement officer of the United States within the

meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to

conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title

18, United States Code. I also am a "federal law enforcement officer" within the meaning of

Rule 41 of the Federal Rules of Criminal Procedure.

### PURPOSE OF AFFIDAVIT

3.      I submit this affidavit in support of an application for a warrant to search the

residence located at 205 High Street, Apartment #1, Berlin, NH (**SP-4**), which, until the date of

1

this affidavit, was occupied, controlled, and used by Redondo DORE, a member of a drug trafficking organization led by Michael MARTINEZ (the "MARTINEZ DTO").

4.      On the morning of the date of this affidavit, October 16, 2024, law enforcement officers executed an arrest warrant for DORE and a search warrant for **SP-4**, both of which were previously issued by this Court. The previously-issued search warrant (Case No. 24-mj-264-01-TSM) authorized a search for evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841, 843(b), and 846. The affidavit in 24-mj-264-01-TSM is attached as Exhibit 1 and incorporated herein by reference. As described below, during the execution of that search warrant, officers observed in plain view items constituting evidence and instrumentalities of violations of 18 U.S.C. § 924(c). This affidavit supports an application for a warrant to search **SP-4**, as further described in Attachment A, to seize such evidence and instrumentalities, as further described in Attachment B.

5.      Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains the material information I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

**<u>PROBABLE CAUSE</u>**

6.      The arrest of DORE occurred after a stop of a vehicle in which DORE was a passenger. At approximately 5:59 AM, law enforcement officers conducting surveillance at **SP-4** witnessed DORE depart the residence and enter a white Jeep sport utility vehicle. The Jeep traveled approximately 2 blocks at which point officers stopped the vehicle. The driver was identified as a person known by the Berlin Police Department to be an active drug user and taken

into custody on a separate outstanding warrant, and DORE, the passenger, was arrested on the federal warrant. Upon a pat-down search of DORE's person, an officer discovered two bags of suspected narcotics in DORE's pants pocket, which were white in color and were packaged in plastic bags in a nature consistent with the illicit narcotics trade. Preliminary field testing indicated that one bag contained cocaine and one bag contained cocaine base.

7.      Shortly after officers encountered DORE, other officers executed the search warrant at **SP-4**. Once the residence was secured, I, together with a Berlin Police Department officer, conducted a walkthrough. During the walkthrough, I made the following observations in the rearmost room of the residence: This room contained cardboard shipping boxes, clothes, bags, work out equipment, two gun cases designed to carry long arms, such as rifles and/or shotguns, two boxes of 9 millimeter ammunition (unknown quantity), a debit card bearing the name Redondo DORE, and two pistols. Three cardboard shipping boxes contained the recipient's name of Redondo DORE at **SP-4**. One of the gun cases was already partially opened and what appears to be a disassembled long arm can be seen. The aforementioned debit card was on a shelf in the closet next to the aforementioned ammunition boxes and second long arms case. One of the pistols is described as having a tan magazine, a tan receiver, visible "red dot" sight, and a black slide. The second pistol was found adjacent to the first pistol and is described as black in color.

8.      Based on the facts set forth in the prior affidavit, as well as DORE's travel from **SP-4** with quantities of controlled substances and the indicia of DORE's occupancy of the room containing the firearms in plain view, there is probable cause to believe that DORE possessed the firearms in furtherance of his commission of drug trafficking offenses as specified in his indictment. Thus, any firearms, firearms accessories, and ammunition within **SP-4**, as well as

3

any electronic or physical documents or records related to the acquisition, possession, or use of

such items constitute evidence and/or instrumentalities of violations of 18 U.S.C. § 924(c).

## **CONCLUSION**

9.      For the reasons described above, I submit that there is probable cause to believe

that evidence and instrumentalities of violations of 18 U.S.C. § 924(c) further described in

Attachment B will be found by searching **SP-4** described in Attachment A.


/s/ Christopher Anderson_____
Christopher Anderson
U.S. Department of Homeland Security
Homeland Security Investigations



The affiant appeared before me by telephonic conference on this date pursuant to Fed. R.
P. 41 and affirmed under oath the contents of this affidavit and application.

_____
United States Magistrate Judge
**Oct 16, 2024**

4

**<u>ATTACHMENT A</u>**

(Description of Property to be Searched)


      **205 High Street, Apartment #1, Berlin, NH ("SP-4")** is a three-story white house with white trim around the windows, and two front doors with "205" in between the doors. The door on the left is Apartment #1. Pictures of the residence and a bird's eye view of its location, respectively, appear below.





**ATTACHMENT B**

(Particular Things to be Seized)

1.      All records, in whatever form, and tangible objects that constitute evidence or instrumentalities of violations of 18 U.S.C. § 924(c) (Possession of a Firearm in Furtherance of a Drug Trafficking Crime), including all records and tangible objects related to:

    a.   Firearms, firearms accessories, and ammunition

    b.   Books, records, receipts, notes, ledgers, and other papers relating to the acquisition, possession, or use of firearms.

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE RESIDENCES LOCATED AT 132 HIGH STREET, APARTMENT D, IN SOMERSWORTH, NH; 20 EMPIRE COURT, APT 111 IN ROCHESTER, NH; 78A SALMON FALLS ROAD IN ROCHESTER, NH; AND 205 HIGH STREET, APARTMENT 1 IN BERLIN, NH | Case No. _____ **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Deputy John Forbes, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I have been employed in law enforcement for approximately 17 years. My current assignment is with the Strafford County Sheriff's Office as a detective within the Investigations unit. I am currently a Task Force Officer ("TFO") for Homeland Security Investigations ("HSI") in the Manchester, New Hampshire Office.  During this assignment, I have participated in multiple intrastate and interstate narcotics investigations.  Prior to this assignment, I  was a member of the New Hampshire State Police Narcotics Investigations Unit. Prior to working at the Strafford County Sheriff's Office, I was employed by the Exeter, NH Police Department, and the New Hampshire State Police. I held the positions of Officer, Trooper, and Detective during my tenure at these two departments. I successfully graduated from the 145th New Hampshire Police Standards and Training Full-Time Police Academy in 2008.

1

2.      From my training and experience, I have personally observed the sale and possession of various controlled substances including, but not limited to, marijuana, cocaine, cocaine base ("crack" cocaine), heroin, fentanyl, and methamphetamine.  I am familiar with the types of packaging used to distribute controlled substances, as well as equipment used such as scales, bags, and cutting agents. I am familiar with equipment used to ingest and use controlled substances, such as needles, syringes, and smoking pipes. I have also learned the preferred methods of ingestion of various controlled substances such as smoking, injecting, snorting/ inhaling, along with dose sizes.  I know that drug traffickers use counter-surveillance techniques to avoid detection.  These techniques include operating or using several vehicles or vehicles registered in other people's names and the use of stash houses or alternate locations to store and hide drugs and assets.  Also, I have learned the methods of distribution of controlled substances such as marijuana, cocaine, crack cocaine, heroin, fentanyl, and methamphetamine. I have further learned through my training and experience that those subjects involved in the illegal distribution of narcotics have ties to other illegal crimes that involve money laundering, fraud and other deceptive behaviors.  I have talked to drug dealers and listened to their conversations, so I am familiar with the coded language often used in these conversations.  I also stay current on the latest technology used to investigate drug crimes.

3.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I also am a "federal law enforcement officer" within the meaning of Rule 41 of the Federal Rules of Criminal Procedure.

**PURPOSE OF AFFIDAVIT**

4.     I submit this affidavit in support of applications for four warrants to search the following SUBJECT PREMISES, which all are believed to be occupied, controlled, or used by members of a drug trafficking organization led by Michael MARTINEZ (the "MARTINEZ DTO"):

        a.     132 High Street, Apartment D, Somersworth, NH (**SP-1**)

        b.     20 Empire Court, Apartment 111, Rochester, NH (**SP-2**);

        c.     78A Salmon Falls Road, Rochester, NH (**SP-3**); and

        d.     205 High Street, Apartment #1, Berlin, NH (**SP-4**).

5.     Based on the information contained herein, there is probable cause to believe that each of the SUBJECT PREMISES contains evidence material to the identification of individuals who are engaged in the commission of, and evidence, fruits, and instrumentalities (as further described in Attachments B-1, B-2, B-3, and B-4) of, the following Target Offenses: 21 U.S.C. § 841(a)(1) (Possession with the Intent to Distribute and the Unlawful Distribution of Controlled Substances), 21 U.S.C. § 846 (Conspiracy to Distribute Controlled Substances), and 21 U.S.C. § 843(b) (Use of a communication facility during or in relation to a controlled substances trafficking offense), as specified in Attachment B-1, B-2, B-3, and B-4 for the property described in Attachments A-1, A-2, A-3, and A-4 respectively.

6.     Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information, I am aware of that is pertinent to the requested search warrant, it does not set forth all of my knowledge about this matter.

**PROBABLE CAUSE**

7.      Starting in February of 2022, members of the Strafford County Sheriff's Office Problem Oriented Policing Unit ("SCSO-POP") have been conducting several investigations into the illegal sale of narcotics by individuals in the Rochester and Dover, NH area. In the months that followed, SCSO-POP conducted several controlled purchases and seizures of fentanyl, cocaine, crack cocaine, and methamphetamine. Further, the SCSO-POP Unit obtained and executed several search and arrest warrants related to these investigations.

8.      As part of the aforementioned enforcement activity, SCSO-POP, along with other law enforcement agencies, conducted interviews with suspected narcotics distributors and received information from various sources, including confidential sources, about narcotic activities, such as sources of supply, phone numbers, "runner" vehicles, and financial information of larger distributors.

9.      By analyzing the above information, agents and investigators of SCSO-POP and Homeland Security Investigations ("HSI") (collectively, "law enforcement") identified Michael MARTINEZ as a large source of supply of fentanyl, cocaine, and methamphetamine to the Seacoast area of New Hampshire and Maine. MARTINEZ's drug trafficking organization (the "MARTINEZ DTO") is based in the Lawrence, Massachusetts area. Through investigative methods, including direct messages from MARTINEZ to the HSI Undercover Agent ("HSI UCA") discussing where he is based, law enforcement determined that MARTINEZ is operating his DTO from the Dominican Republic.

10.     Through investigative methods including but not limited to controlled purchases, surveillance, and source debriefs, law enforcement is aware that the MARTINEZ DTO utilizes "runners" to transport narcotics from Lawrence, Massachusetts to New Hampshire and Maine.

4

Once the MARTINEZ DTO receives an order for narcotics, MARTINEZ will then communicate

that order to his runners in Lawrence and instruct the runners where to deliver the requested

amount of narcotics and how much money the runner should collect for the order. The runners

deliver to various sub-distributors located throughout New Hampshire. These sub-distributors

operate out of different residences including SP-1, SP-2, SP-3, and SP-4. This information has

been established via surveillance, controlled purchases, and communications with MARTINEZ,

in addition to other investigative techniques.

11.     On October 9, 2024, a federal grand jury in the District of New Hampshire

returned an indictment charging ten individuals with participating in a conspiracy to distribute

controlled substances. The indictment included Michael MARTINEZ, who manages the DTO

from the Dominican Republic, Donaida GONZALEZ, his mother who operates a suspected stash

house in Massachusetts, Massachusetts-based runners Eddy Balbuena-GOMEZ, and Diana

Carolina Bautista ARIAS, and New Hampshire-based sub-distributors Craig GRANT, Jamie

BONNER, Katie CURTIS, Tabitha O'BRIEN, Redondo DORE, and Trevor MACKENZIE.

Arrest warrants were issued for all of these defendants.  As of yet, none of these individuals have

been arrested.

### Controlled Purchase from MARTINEZ DTO Using Confidential Source

12.     During January 2024, a confidential source ("CS#1")[1], began providing

information to law enforcement about the MARTINEZ DTO.

---

[1] CS#1 is a narcotics addict who has been providing information to law enforcement in consideration for favorable treatment regarding charges including possession of a controlled drug, transporting drugs in a motor vehicle, and felonious use of a firearm.  CS#1 has a prior criminal history including narcotics and driving-related offenses. CS#1 has also been compensated approximately $1600 for cooperation in this matter. Since becoming a confidential source, CS#1 was recently charged in New Hampshire with the following: kidnapping, simple

13.     On February 20, 2024, at the direction of law enforcement, CS#1 contacted

MARTINEZ through the Signal application at a phone number ending in 0429 listed in the

Signal application as "yippy hippy," a number CS#1 knew to be associated with a drug supplier

named "Miguel," whom law enforcement confirmed through records obtained regarding the

phone number and the CashApp account provided by CS, is MARTINEZ. In communications on

Signal, MARTINEZ agreed to deliver a quantity of cocaine and fentanyl to CS#1 in New

Hampshire. MARTINEZ advised that a female runner would be at a business establishment in

Dover to meet CS#1.

14.     Later that day, CS#1 met with the female runner in her vehicle and completed the

transaction: CS#1 handed the female runner $1,500 in cash, and the runner handed CS#1 what

laboratory analysis later confirmed to be bags containing 19.71 grams of fentanyl and 55.31

grams of cocaine.  Law enforcement used standard control measures for this drug transaction,

including but not limited to searches of CS#1's person (which yielded negative results for any

money or contraband not accounted for in the controlled purchase) before and after the

transaction.

15.     After the meeting between CS#1 and the female runner, law enforcement

conducted surveillance on the female runner.  Law enforcement observed the runner make

several short stops at known residences of MARTINEZ DTO customers who are drug

redistributors in Rochester, Dover, as well as to 132 High Street, Apartment D in Somersworth,

---

assault, robbery, and criminal threatening.  CS#1 has previously provided information in cases
that resulted in the arrests of narcotics distributors and resulted in large narcotics and currency
seizures.  Although CS#1 has a serious history of criminal behavior, the evidence developed
from CS#1's participation in this investigation is reliable, due to the use of investigative controls,
recordings, and corroboration via independent evidence.

NH (**SP-1**).  She then returned to a residence in Methuen, Massachusetts, which investigators believe to be a stash house for the MARTINEZ DTO.

### Introduction of HSI Undercover Agent to MARTINEZ

16.     During a phone conversation between CS#1 and MARTINEZ on the night of February 20, 2024, CS#1 mentioned that CS#1 knew other customers looking for large quantities of narcotics.  On February 26, 2024, MARTINEZ contacted CS#1 and requested that CS#1 provide the contact information for these larger customers so MARTINEZ could contact them to sell them narcotics.  In response, CS#1 then provided MARTINEZ with the contact information for an HSI UCA.

17.     At approximately 11:00 pm on February 26, 2024, MARTINEZ reached out to the HSI UCA on the Signal Application. The HSI UCA began communicating with MARTINEZ, through text message and phone calls, about purchasing large quantities of fentanyl and methamphetamine. During subsequent conversations with MARTINEZ, MARTINEZ asked the HSI UCA how much "up" (cocaine) and how much "down" (fentanyl) the HSI UCA would want to order on a weekly basis.

18.     The HSI UCA stated that they would only be interested in the "down" and they would be looking for approximately 20-30 "sticks." I know from my training and experience that a "stick" is 10-grams of fentanyl. MARTINEZ stated that he would be able to supply that and more if the HSI UCA wanted additional quantities of fentanyl. MARTINEZ further stated that he would charge the HSI UCA $100 per "stick."

**Controlled Buy with Undercover Agent on March 3, 2024**

19.      On March 3, 2024, the HSI UCA messaged MARTINEZ that they would be around the next day and have cash to purchase narcotics. The HSI UCA asked for a pound of "ice" and 10 "sticks" for $2,000. I know from my training and experience that "ice" is a reference to methamphetamine. MARTINEZ stated that he was having issues with the "ice" and that he was not making any money. MARTINEZ stated that his "runner" doesn't like to travel with "ice" and that he would have to pay her $200 to deliver the narcotics. He further stated that he would "cuff" the 10 "sticks" to the HSI UCA. Based on my training and experience, I understand that to "cuff" means to provide without upfront payment.

20.      MARTINEZ asked if the HSI UCA could meet his runner in Seabrook, NH, and provided the HSI UCA with an address. After some further discussion, MARTINEZ stated he would supply the HSI UCA with 30 "sticks" if he could not supply any "ice" and the HSI UCA would only have to pay $2,000 for 20 "sticks" and the other 10 "sticks" would be "cuffed".

21.      During the afternoon of March 4, 2024, MARTINEZ told the HSI UCA that a female was on her way to meet, and she would be driving a Toyota.  A short time later, law enforcement observed a 2006 Toyota Corolla with Massachusetts registration park next to the HSI UCA's vehicle at the meeting location in Seabrook. A Hispanic female whom the HSI UCA recognized as Alba Cruz exited the Toyota and got into the HSI UCA's vehicle. The HSI UCA recognized Ms. Cruz because, prior to the meeting, law enforcement showed the HSI UCA a photograph of Cruz; law enforcement had previously identified her as the female "runner" for the MARTINEZ DTO who had conducted the controlled purchase with CS#1 on February 20, 2024. They identified her by running the plates of the vehicle Cruz drove to the February 20, 2024 controlled purchase to obtain a name, discovering a prior traffic stop of Cruz by the Brentwood

**Controlled Buy with Undercover Agent on March 3, 2024**

19.　　On March 3, 2024, the HSI UCA messaged MARTINEZ that they would be around the next day and have cash to purchase narcotics. The HSI UCA asked for a pound of "ice" and 10 "sticks" for $2,000. I know from my training and experience that "ice" is a reference to methamphetamine. MARTINEZ stated that he was having issues with the "ice" and that he was not making any money. MARTINEZ stated that his "runner" doesn't like to travel with "ice" and that he would have to pay her $200 to deliver the narcotics. He further stated that he would "cuff" the 10 "sticks" to the HSI UCA. Based on my training and experience, I understand that to "cuff" means to provide without upfront payment.

20.　　MARTINEZ asked if the HSI UCA could meet his runner in Seabrook, NH, and provided the HSI UCA with an address. After some further discussion, MARTINEZ stated he would supply the HSI UCA with 30 "sticks" if he could not supply any "ice" and the HSI UCA would only have to pay $2,000 for 20 "sticks" and the other 10 "sticks" would be "cuffed".

21.　　During the afternoon of March 4, 2024, MARTINEZ told the HSI UCA that a female was on her way to meet, and she would be driving a Toyota.  A short time later, law enforcement observed a 2006 Toyota Corolla with Massachusetts registration park next to the HSI UCA's vehicle at the meeting location in Seabrook. A Hispanic female whom the HSI UCA recognized as Alba Cruz exited the Toyota and got into the HSI UCA's vehicle. The HSI UCA recognized Ms. Cruz because, prior to the meeting, law enforcement showed the HSI UCA a photograph of Cruz; law enforcement had previously identified her as the female "runner" for the MARTINEZ DTO who had conducted the controlled purchase with CS#1 on February 20, 2024. They identified her by running the plates of the vehicle Cruz drove to the February 20, 2024 controlled purchase to obtain a name, discovering a prior traffic stop of Cruz by the Brentwood

Police Department, where she identified herself as Cruz, and then comparing surveillance images taken from the February 20, 2024 controlled buy to the body camera images of Cruz from the Brentwood Police Department traffic stop as well as to images of Cruz on Facebook.  CS#1 also separately identified her as being the February 20, 2024 runner from a photo presented to CS#1.

22.     Inside the HSI UCA's vehicle, the HSI UCA provided $2,000 to Cruz and she provided the HSI UCA a baggie containing what laboratory analysis later confirmed to be 340.54 grams of fentanyl.[2]

23.     At the conclusion of the transaction, law enforcement continued to surveil Cruz as she drove back to the area of Lawrence, MA.  Once in Lawrence, MA, Cruz made a brief stop at a jewelry store then traveled to a residence in Methuen investigators believe to be a stash house for the MARTINEZ DTO, where surveillance was terminated.

**Controlled Buy with Undercover Agent Involving a New Runner on March 26, 2024**

24.     Around the time of the aforementioned motor vehicle stop of ARIAS, MARTINEZ changed the runner that delivered narcotics to the HSI UCA. On March 25, 2024, the HSI UCA contacted MARTINEZ and asked if they could purchase 20-25 "sticks" the next day. MARTINEZ confirmed that he would be ready and that he would supply the time to meet his "runner."

25.     On March 26, 2024, the HSI UCA contacted MARTINEZ. MARTINEZ asked the HSI UCA how many "sticks" the HSI UCA wanted to purchase. The HSI UCA stated "25".

---

[2]  This transaction, like the other controlled purchases conducted by the HSI UCA described in this Affidavit, was electronically recorded.

9

26.     MARTINEZ asked where the HSI UCA wanted to meet his runner. The HSI UCA specified the Dover, NH area, and that they should meet around 6:30 pm. At approximately 6:10 pm, the HSI UCA asked MARTINEZ when the "runner" was going to be in Dover. MARTINEZ supplied the HSI UCA with an address in Dover and said the "runner" would be there in about 40 minutes. MARTINEZ confirmed that the "runner" would be bringing "25."

27.     A short time later, MARTINEZ called the HSI UCA and explained that he was sending his "boy" to meet the HSI UCA. After the conversation ended, the HSI UCA sent MARTINEZ a message asking if he was sending a new runner (i.e., not the female runner from the prior controlled purchases). MARTINEZ stated that since the previous runner was having car issues, he was sending his cousin.

28.     The HSI UCA instructed MARTINEZ to have his cousin get into the HSI UCA's vehicle. MARTINEZ stated that his cousin was driving a "gray Saturn."

29.     Law enforcement observed a gray Saturn arrive in the parking lot and park next to the HSI UCA's vehicle. Law enforcement observed the Hispanic male operator of the Saturn enter the passenger seat of the HSI UCA's vehicle. According to the HSI UCA, they discussed the narcotics purchase and the HSI UCA provided the Hispanic male with $2,500 and the Hispanic male provided the HSI UCA with a bag containing what laboratory analysis later confirmed to be 250.28 grams of fentanyl.

**Controlled Buy with Undercover Agent on April 8, 2024 with Travel to SP-1 and SP-2**

30.     On April 8, 2024, the HSI UCA contacted MARTINEZ and arranged the purchase of 20 "sticks" for $2,000. MARTINEZ and the HSI UCA agreed the transaction would take place in Manchester, NH at around 3:00 pm.

10

31.     At approximately 3:00 pm, MARTINEZ sent a message to the HSI UCA that "his guy" was about 30 minutes away. The HSI UCA asked if it was the same individual from the previous meet and MARTINEZ confirmed that it was the same person.

32.     At approximately 3:40 pm, I observed the same Saturn driving on Brown Ave. in Manchester. The Saturn pulled into the parking lot of a business establishment and parked next to the HSI UCA's vehicle.

33.     The HSI UCA observed the same Hispanic male as in the prior controlled purchase exit the Saturn and get into the passenger seat of the HSI UCA's vehicle. The HSI UCA and the male runner discussed the narcotics purchase. The HSI UCA then provided the Hispanic male with $2,000 in cash and the Hispanic male provided the HSI UCA with a bag containing what laboratory testing later confirmed to be 201.61 grams of fentanyl.

34.     During the sale in the vehicle, the HSI UCA observed the Hispanic male remove the suspected fentanyl from a black backpack. According to the HSI UCA, as the Hispanic male exited the vehicle, he stated to the HSI UCA that today was going to be a long day. The Hispanic male then got back into the Saturn and left the parking lot.

35.     Law enforcement then surveilled the Saturn as it traveled to Rochester, NH where law enforcement observed the Hispanic male runner meet with several previously identified MARTINEZ DTO redistributors, including the Apple Ridge Apartments located at 20 Empire Court in Rochester.  This is the location of **SP-2**, the residence of Shawn and Tabitha O'BRIEN, known customers of the MARTINEZ DTO discussed later in this affidavit.   The runner then drove directly to **SP-1**, the known residence of Craig GRANT, another known customer of MARTINEZ described later in this Affidavit. The driver then drove to the Riviera Motel in Rochester and parked in the parking lot. Several people were observed approaching the Saturn,

11

including Katie CURTIS, a known customer and drug redistributor. The Saturn then ultimately returned to Lawrence, MA.  At approximately 7:22 pm, in the area of Jackson Street, Lawrence, MA, surveillance was discontinued. Investigators believed that the runner was conducting counter surveillance techniques to determine if he was being followed by law enforcement.

**Controlled Buy with Undercover Agent on April 29, 2024**

36.     On April 29, 2024, the HSI UCA contacted MARTINEZ and arranged the purchase of 30 "sticks" for $3,000. MARTINEZ and the HSI UCA discussed the meeting location and time. They agreed the transaction would take place in Dover, NH around 6:00 pm that same day.

37.     Prior to the meeting, the HSI UCA contacted MARTINEZ again and asked who he was sending to the meeting. MARTINEZ advised that it was going to be the same male runner from the previous deal, and he would be driving a black 2009 Mercedes C-Class.

38.     At approximately 6:30 pm, law enforcement observed a black 2009 Mercedes C-Class traveling on Dover Point Road in Dover, NH towards the meet location. At this time, law enforcement observed the registration of the vehicle to be Massachusetts registration. Law enforcement observed the Mercedes turn into the parking lot of the meeting location in Dover, NH. Law enforcement checked the registration number for the Subject Vehicle (3MHK52) with the Massachusetts Registry of Motor Vehicles and learned that the vehicle is in fact a 2009 Mercedes C-class, registered to Eddy Balbuena-GOMEZ, of 82 Bennington Street, Lawrence, MA.

39.     The Mercedes parked in the rear parking lot of the meet location in Dover. MARTINEZ contacted the HSI UCA and directed them to that parking lot. A short time later, the

12

HSI UCA arrived in the same parking lot, and parked next to the Mercedes. At that time, the Hispanic male runner exited from the Mercedes and entered the HSI UCA's vehicle.

40.    As the Hispanic male entered the HSI UCA's vehicle, the HSI UCA recognized this Hispanic male as the same runner whom HSI UCA met on the last three previous controlled narcotic purchases from the MARTINEZ DTO.

41.    The HSI UCA and the Hispanic male discussed the narcotics purchase and completed the narcotics transaction, in which the HSI UCA provided the Hispanic male $3,000 and, in exchange, the Hispanic male provided the HSI UCA with what laboratory analysis later confirmed to be 317.20 grams of fentanyl.

**GPS Tracker Warrant and Identification of Male Runner as Eddy Balbuena GOMEZ**

42.    On May 2, 2024, a GPS Tracker Warrant application for the aforementioned Mercedes was granted by the Honorable Magistrate Judge Page Kelley for the District of Massachusetts (case number 24-6352-MPK). On May 3, 2024, law enforcement placed the GPS tracking device on the Mercedes.

43.    On May 8, 2024, law enforcement learned that a Massachusetts State Trooper previously stopped the aforementioned Saturn and it was being driven by Eddy Balbuena-GOMEZ.  The HSI UCA viewed a Massachusetts Drivers License photograph of GOMEZ and confirmed that GOMEZ was the runner during the previous narcotics transactions.

**Controlled Buy with Undercover Agent on June 25, 2024 with Travel to SP-1**

44.     On June 25, 2024, the HSI UCA made contact with MARTINEZ and arranged the purchase of 20 "sticks" for $2,000.  MARTINEZ and the HSI UCA agreed to meet at in Seabrook, NH.

45.     At approximately 6:51 pm., surveilling investigators observed GOMEZ arrive at and enter the suspected stash house in Methuen, Massachusetts. At approximately 7:25 pm., GOMEZ exited that residence, entered his vehicle and left the area.  According to the GPS data, GOMEZ drove from the Methuen residence to the prearranged meet location and arrived at approximately 8:09 p.m., parking next to the HSI UCA.

46.     At that time, the HSI UCA exited the vehicle and got into GOMEZ's black Mercedes on the passenger's side. Once in the vehicle, the HSI UCA handed GOMEZ $2,000 and GOMEZ handed the HSI UCA what laboratory analysis later confirmed to be 200.04 grams of fentanyl.

47.     Following the above transaction, GPS tracker information showed the Mercedes travel north to the Strafford County area and stopped at **SP-1** and an address in Dover, New Hampshire, before traveling back to the Methuen, Massachusetts residence.

**Controlled Buy with Undercover Agent on July 9, 2024 and Travel to SP-2 and SP-3**

48.     On July 9, 2024, the HSI UCA made contact with MARTINEZ and arranged the purchase of 20 "sticks" for $2,000. MARTINEZ and the HSI UCA agreed to meet outside a business establishment in Londonderry, New Hampshire at around 6:00 pm.

49.     The HSI UCA arrived at the meet location at approximately 5:50 p.m. A short time later, the HSI UCA received a message from MARTINEZ asking if the meeting time could

be changed to 6:30 pm and the HSI UCA agreed. At approximately 6:32 pm., the HSI UCA sent

MARTINEZ a message asking where the runner was. MARTINEZ responded with a voice

message via Signal stating, "Yo should be there in like 30 minutes bro my bad, this woman  bro,

took way to long."

      50.     Law enforcement observed GOMEZ arrive at the Methuen residence, and after

spending some time there, travel from that residence to Londonderry, New Hampshire and park

next to the HSI UCA's vehicle. At that time, the HSI UCA got into the passenger seat of the

black Mercedes. Once in the vehicle, the HSI UCA and GOMEZ made some small talk and the

UCA handed GOMEZ $2,000. While GOMEZ counted the money, the HSI UCA noticed several

large packages of what the HSI UCA believed to contain fentanyl based on training, experience,

and previous narcotic transactions with the MARTINEZ DTO. Once GOMEZ was done

counting the money he then handed the HSI UCA a plastic bag containing what laboratory

analysis later confirmed to be 199.50 grams of fentanyl. The HSI UCA got out of GOMEZ's

vehicle and got back into their own vehicle. Law enforcement continued surveillance on

GOMEZ as he departed the meet location.  Over a course of approximately two hours, GOMEZ

made several stops at the residences of known MARTINEZ DTO redistributors in the Strafford

Country area; specifically, the Apple Ridge apartments in Rochester in which **SP-2** is located,

and Apartment 78A Salmon Falls Road in Rochester **(SP-3)**, At approximately 10:34 pm., GPS

data showed the vehicle at another address in Lawrence, MA for a short time before traveling

back to the Methuen residence.

**Controlled Buy with Undercover Agent on September 3, 2024 with Travel to SP-1**

51.     On September 3, 2024, the HSI UCA made contact with MARTINEZ and arranged the purchase of 20 "sticks" for $2,000. The HSI UCA asked MARTINEZ if he would "front" an extra 10 "sticks" to be paid back at a later date.  MARTINEZ stated that he would. MARTINEZ and the HSI UCA agreed to meet outside the same business establishment as before in Londonderry, New Hampshire at around 5:00 pm.

52.     At approximately 5:30 pm., GOMEZ arrived at the meeting location driving the Mercedes and parked next to the HSI UCA's vehicle.

53.     At that time, the HSI UCA exited the vehicle and got into GOMEZ's black Mercedes on the passenger's side. Once in the vehicle, the HSI UCA handed GOMEZ $2,000 and GOMEZ handed him what laboratory analysis later confirmed to be 299.14 grams of fentanyl.

54.     At the conclusion of the transaction, GOMEZ departed the area and traveled north on Interstate 93.  Through the use of the GPS tracker, GOMEZ was observed making several stops at the residences of known MARTINEZ DTO redistributors in the Strafford Country area before heading back to Massachusetts; specifically including the known residence of Katie CURTIS at the time in Rochester, as well as **SP-1,** the known residence of Craig GRANT and Jamie BONNER.

**September 4, 2024 Stop of ARIAS's Car and Subsequent Search of ARIAS's Phones**

55.     On September 4, 2024, the New Hampshire State Police Mobile Enforcement Team ("NHSP-MET") conducted a traffic stop of a Jeep driven by ARIAS and visually identified the driver as ARIAS. ARIAS identified herself as Alba Cruz and denied being ARIAS.

There was also a female passenger present. ARIAS was arrested on a bench warrant and the Jeep was seized.

56.     Investigators executed a state search warrant on the Jeep and seized two cell phones and what laboratory analysis later confirmed to be 1,730.78 grams of methamphetamine and 497.17 grams of cocaine.  The cell phones were searched pursuant to a state warrant. Communications on the cell phones included correspondence between MARTINEZ and ARIAS discussing drug transactions.

**Other HSI UCA Controlled Purchases with the MARTINEZ DTO**

57.     The HSI UCA arranged with Martinez to conduct numerous other controlled purchases for narcotics during the timeframe from February 2024 to September 2024 during the course of this investigation; the controlled purchases described above are only a sample of these transactions.  The most recent controlled purchase occurred on September 30, 2024.  During that controlled purchase, at a meeting location in Londonderry, NH that the HSI UCA had arranged with MARTINEZ, the HSI UCA provided GOMEZ $7,000 in exchange for what investigators believe based on training and experience, the context of the transaction, the appearance of the substance, and the weight of the substance with packaging, to be approximately 1,000 grams of fentanyl (laboratory results are pending).

**Additional Information about SP-1, and its Residents'
Connections to the Martinez DTO**

58.     In early 2024, CS#1 advised law enforcement that a couple, Craig GRANT and Jamie BONNER, were narcotics distributors in the Strafford County, NH area and were obtaining large amounts of narcotics through the MARTINEZ DTO.  CS#1 informed law

enforcement that BONNER and GRANT resided at **SP-1,** and that runners from the MARTINEZ

DTO would deliver narcotics to BONNER and GRANT at **SP-1**.

59.     Following the May 2024 installation of the GPS tracking device on the 2009

Mercedes, which GOMEZ drove to multiple controlled purchases previously discussed in this

Affidavit, through the use of tracker data and physical surveillance, law enforcement observed

that GOMEZ made numerous stops at **SP-1,** including stops after the controlled buys on April 8,

2024, June 25, 2024, and September 3, 2024 described above, as well as other stops described

below. Law enforcement observed that the stops at **SP-1** were for brief amounts of time,

consistent with that of narcotics deliveries.

60.     During the month of June 2024, investigators from the Hampton, NH and

Durham, NH Police Departments informed SCSO-POP law enforcement personnel that they

were currently investigating a string of thefts involving Craig GRANT and his residence in

Somersworth, NH (**SP-1**). I was contacted by a Hampton Police officer regarding a theft ring in

Rockingham and Strafford County in which subjects had stolen items and reportedly used them

to purchase narcotics from a subject identified by one of the theft ring suspects as "JR" residing

on High Street in Somersworth, NH.  Detective Brown advised that detectives from Durham

Police Department had been furthering the investigation.

61.     On June 24, 2024, I spoke with investigators from the Durham Police Department

("Durham PD") in reference to the investigation.  They advised that they had been investigating

a string of thefts in Durham and had identified a number of suspects who were also the subject of

theft investigations in Hampton and Seabrook.  Certain of those suspects provided information in

interviews with Durham PD investigators that the stolen goods would be found at a residence

belonging to "JR," who was exchanging the stolen goods for crack cocaine.  Investigators

determined "JR" was Craig GRANT, who resides at **SP-1.**

### Execution of a State Search Warrant at SP-1 on June 26, 2024

62.     Based on information from these interviews and other evidence, on June 25, 2024, I applied for and was granted a New Hampshire search warrant at **SP-1**.

63.     On June 26, 2024, law enforcement executed the New Hampshire State search warrant of **SP-1**. GRANT and BONNER were at the residence at the time. Law enforcement's search of **SP-1** yielded what laboratory testing later confirmed to be 2.169 grams of methamphetamine, 27.9 grams of cocaine, 97.8 grams of fentanyl, and 1.65 grams of crack cocaine from within the residence. Law enforcement also seized four cell phones from within **SP-1**, two of which belonged to GRANT and BONNER.

64.     During the search of **SP-1**, GRANT was allowed to sit inside the apartment under law enforcement supervision due to the heat outside.  During that time, GRANT told law enforcement spontaneously that he could "help get his guy". GRANT explained that "his guy" had delivered narcotics to him the night prior, and GRANT knew him as Jose Martinez from Massachusetts.  GRANT also said that Martinez generally sends a runner to deliver what GRANT orders within a couple of hours. He said he did not know the name of the runner who delivered drugs the prior night, but described him as a thin man with glasses and scruff on his face who drives a black Mercedes with Massachusetts tags. He advised that, that prior night (June 25, 2024) the runner had brought him two ounces of cocaine and 100 grams of "dope."  In my training and experience, I know "dope" generally refers to heroin or fentanyl.

65.     GRANT advised that he had paid $3,600 that night, and was paying $900 per ounce of cocaine.  GRANT also mentioned he was paying down some of his debt. GRANT

added that he is often "fronted" drugs when he did not have the money to pay for them. GRANT advised that he was getting deliveries every three to four days.

66.     Investigators believe that GRANT was describing drug deliveries from GOMEZ; this conclusion is based on GRANT's description of the runner who made the delivery, which matches GOMEZ's physical appearance, as well as GRANT's description of the runner's vehicle, a Mercedes with Massachusetts plates, which matches the description of GOMEZ's vehicle, and his description of his supplier who sent the runner as having the name "Martinez." Furthermore, the timing of the delivery that GRANT described aligned with the timing that the tracker on GOMEZ's vehicle showed GOMEZ's vehicle arrived at **SP-1**: on June 25, 2024, the day before the search warrant was executed.

67.     The cell phones seized from BONNER and GRANT were subsequently analyzed by law enforcement. That phone analysis revealed communications among MARTINEZ and GRANT and BONNER.  Included in those communications is discussion of large narcotics deliveries taking place at **SP-1**, consistent with the information that GRANT had provided to law enforcement on the day the search warrant was executed at **SP-1**.


**GOMEZ's Travels to SP-1 after Execution of the State Search Warrant**

68.     Following the execution of the search warrant at **SP-1**, data received from the GPS tracker on GOMEZ's Mercedes showed that the vehicle made a stop at **SP-1** on the evening of June 26, 2024—the day after the search warrant was executed. The length of the stop was similar to GOMEZ's vehicle's previous stops at **SP-1**, consistent with a narcotics-related delivery.

69.     In the months following the search warrant at **SP-1**, data received from the GPS tracker on GOMEZ's vehicle shows that his vehicle has continued to make frequent short stops, consistent with narcotics related deliveries, to **SP-1**.

70.     Given GRANT's history of conducting drug transactions with a runner whose physical description matches that of GOMEZ, the timing of the stops GOMEZ's vehicle makes to **SP-1**, and the fact that transacting drugs is the only purpose investigators know for GOMEZ to meet GRANT at his residence, there is probable cause to believe that these trips were for the purpose of conducting further drug transactions and that evidence of narcotics distribution will be found inside **SP-1**.

71.     I know from my training and experience that drug distributors often use cellular telephones to arrange drug transactions with customers and redistributors.  I know from prior investigation in this case that GRANT and BONNER used cellular telephones to communicate with MARTINEZ and arrange drug transactions, including drug transactions at **SP-1**.  There is therefore probable cause to believe that GRANT and BONNER used a cellular phone to arrange with MARTINEZ the recent trips GOMEZ made to **SP-1** for suspected drug deliveries, and that evidence of narcotics distribution will be found on cellular phones used by GRANT and BONNER.

### Additional Information about the Residents of SP-2 and SP-2's Connections to the MARTINEZ DTO

72.     In early 2024, CS#1 advised law enforcement personnel that the MARTINEZ DTO had a number of large customers in the Strafford County, NH area and was able to identify married couple Tabitha O'BRIEN (T. O'BRIEN) and Shawn O'BRIEN (S. O'BRIEN) (together

"the O'BRIENS") as narcotics distributors in the Rochester, NH area that were obtaining large amounts of narcotics from the MARTINEZ DTO.

73.     Law enforcement identified the telephone numbers for T. O'BRIEN and S. O'BRIEN using open source and law enforcement resources.  Law enforcement conducted toll analysis on numbers used by MARTINEZ, and that analysis showed that T. O'BRIEN had at least 798 separate contacts with MARTINEZ between December 15, 2023 and August 4, 2024.

74.     Law enforcement also investigated a CashApp account belonging to MARTINEZ, which showed that T. O'BRIEN had paid MARTINEZ approximately $1,000.00 between July 10, 2023 and April 28, 2024.

75.     A search warrant was completed on MARTINEZ's TextNow account connected to his telephone numbers, and the search warrant showed substantial text message evidence supporting a drug distribution conspiracy between MARTINEZ and the O'BRIENS. In those text messages, MARTINEZ confirms sales of large quantities of narcotics to the O'BRIENS in exchange for large quantities of money from them.

76.     Through law enforcement database searches, law enforcement was able to identify the residence of T. O'BRIEN and S. O'BRIEN as **SP-2**. In physical surveillance at **SP-2**, law enforcement located vehicles registered to the O'BRIENS.

77.     Following the installation of the GPS tracking device on the 2009 Mercedes, which GOMEZ drove to multiple controlled purchases, through the use of tracker data and physical surveillance, law enforcement observed that GOMEZ made numerous stops at **SP-2**, including the stops after the controlled buys on April 8, 2024 and July 9, 2024 described above. Law enforcement observed that the stops at **SP-2** were for brief amounts of time, consistent with that of narcotics deliveries.  GOMEZ would often stop at the residence late at night.  For

22

example, one of the trips that GOMEZ's vehicle made to **SP-2** occurred on September 7, 2024 at 12:28 am. That day, GOMEZ's vehicle remained outside **SP-2** until 12:34 am and then departed from the area.

78.     Physical surveillance by investigators identified that when GOMEZ arrived at **SP-2**, GOMEZ met with the O'BRIENS and would commonly meet within **SP-2**.

79.     Investigators made contact with management of the apartment complex in which **SP-2** is located and, with management's consent, viewed video of the hallways of the apartment building in which **SP-2** is located at numerous times during which GOMEZ was present. In doing so, investigators observed T. O'BRIEN meeting with GOMEZ and allowing him to enter the apartment building. T. O'BRIEN and GOMEZ walked to the area of **SP-2** and met for a brief period, consistent with that of a narcotics transaction.

**Execution of Prior New Hampshire State Search Warrant at SP-2 on September 9, 2024**

80.     On Monday, September 9, 2024, I applied for and was granted a State of New Hampshire search warrant application for **SP-2**.

81.     On September 9, 2024, law enforcement executed the search warrant at **SP-2**. During that search, law enforcement located T. O'BRIEN and S. O'BRIEN within **SP-2**.  The search also revealed three cellular telephones and a large ziplock bag containing brown powder, which laboratory results later confirmed to be 65 grams of fentanyl.  This search occurred only two days after GOMEZ had visited **SP-2**.

82.     Analysis was completed on the cellular phones seized from **SP-2**. Phone communications confirmed T. O'BRIEN's contacts with MARTINEZ and the delivery of large amounts of narcotics to the O'BRIENS in exchange for money.

23

**GOMEZ's Travels to SP-2 after the September 9, 2024 Search of SP-2**

83.     Following the search warrant at **SP-2**, tracker information from the GPS Tracker on GOMEZ's vehicle showed that he continued to make stops at **SP-2**, consistent with his prior narcotics deliveries. The most recent data from the GPS tracker shows GOMEZ's vehicle going to **SP-2** on September 19, September 20 and September 24, 2024.

84.     On each of these occasions, GOMEZ's vehicle stopped at **SP-2** for only a brief period of time, consistent with the prior occasions.  Given the O'BRIENS history of conducting drug transactions with the runner, the timing of the stops the runner makes to **SP-2**, and the fact that transacting drugs is the only purpose investigators know of for GOMEZ to meet the O'BRIENS at their residence, there is probable cause to believe that these trips were for the purpose of conducting further drug transactions and that evidence of narcotics distribution will be found inside **SP-2**.

85.     I know from my training and experience that drug distributors often use cellular telephones to arrange drug transactions with customers and redistributors.  I know from prior investigation in this case that the O'BRIENS used cellular telephones to arrange drug transactions with MARTINEZ, including drug transactions at **SP-2**.  There is probable cause to believe that the O'BRIENS used a cellular phone to arrange with MARTINEZ the recent trips GOMEZ made to **SP-2** for suspected drug deliveries, and that evidence of narcotics distribution will be found on cellular phones used by the O'BRIENS.

**Additional Information about SP-3, and its Resident's Connections to the DTO**

86.     In early 2024, CS#1 advised law enforcement that Trevor MACKENZIE was a narcotics distributor in the Rochester, NH area and was obtaining large amounts of narcotics through the MARTINEZ DTO.

87.     Law enforcement identified the telephone number for MACKENZIE using open source and law enforcement resources.  Law enforcement conducted toll analysis on phone numbers used by MARTINEZ, which revealed that MACKENZIE had at least 354 separate contacts with MARTINEZ between the dates of May 8, 2024 and August 6, 2024.

88.     Analysis of MARTINEZ's CashApp accounts showed that MACKENZIE had paid MARTINEZ approximately $4,900.00 between April 28, 2024 and July 3, 2024.

89.     A search warrant was completed on MARTINEZ's TextNow account, which revealed text message evidence supporting a drug distribution conspiracy between MARTINEZ and MACKENZIE. There are messages from MARTINEZ to MACKENZIE directing him to use the Signal Application. In text messages, MARTINEZ confirms the delivery of large quantities of narcotics to MACKENZIE in Rochester, NH. The messages further confirm that MACKENZIE pays MARTINEZ substantial sums of money for narcotics deliveries.

90.     Through law enforcement database searches, law enforcement was able to identify the residence of MACKENZIE to be 78A Salmon Falls Road, Rochester, NH (**SP-3**).  In physical surveillance at **SP-3** as recently as September 2024, law enforcement observed MACKENZIE going into and out of **SP-3** on numerous occasions at various hours of the day and night, consistent with his residing at **SP-3**.

91.     Following the May 2024 installation of the GPS tracking device on GOMEZ's 2009 Mercedes, used as a vehicle to deliver drugs, through the use of tracker data and physical

surveillance, law enforcement observed that GOMEZ made numerous stops at **SP-3**. Specifically, data shows that GOMEZ's vehicle has been at **SP-3** on dozens of occasions since May 2024. Law enforcement observed that the stops at **SP-3** were for brief amounts of time, consistent with that of narcotics deliveries.

92.     Following the controlled buy with the HSI UCA on July 9, 2024, previously described in this Affidavit, surveilling investigators saw GOMEZ drive his vehicle to Rochester, NH. Surveillance units followed GOMEZ's vehicle as it made a number of stops at residences of known customers of the MARTINEZ DTO. At approximately 9:10 pm, surveillance units observed GOMEZ's vehicle arrive at **SP-3**. At that time, a male exited **SP-3** and entered the front passenger seat of GOMEZ's vehicle. After a brief meeting, GOMEZ departed from **SP-3**. The length of the interaction and the fact that the meeting occurred in GOMEZ's vehicle, known to be used to transport narcotics, supports that this meeting was likely a narcotics-related transaction.

93.     Furthermore, on July 23, 2024, investigators conducted surveillance with interdiction personnel at **SP-3**. At approximately 3:41 pm, a male exited **SP-3** and entered a blue Nissan Versa. During a subsequent motor vehicle stop of the Nissan Versa in the area of Rochester, NH, law enforcement identified the driver (as an individual other than MACKENZIE) and found him to be in possession of what law enforcement believes based on their training and experience, as well as the packaging and appearance of the substances, to be crack cocaine and fentanyl, as well as narcotics-related paraphernalia.

94.     Later that same day, following the stop of the Nissan Versa, law enforcement again established surveillance at **SP-3**. At approximately 5:25 pm, two male subjects exited from **SP-3**. The men then departed from the area of **SP-3** in a Dodge Journey and a Chevrolet Tahoe.

Law enforcement interdiction personnel stopped the Chevrolet Tahoe. The two male occupants were identified, and one was arrested at that time for an active arrest warrant. The arrestee was in possession of fentanyl at the time he was arrested.  During the traffic stop, MACKENZIE (the occupant of **SP-3**) arrived on scene in the Dodge Journey and observed the car stop for a period of time while the male subject was arrested. After briefly observing the scene, MACKENZIE departed from the area.

95.     In the last roughly 30-day period alone, tracker data shows that GOMEZ's vehicle made brief stops at **SP-3** consistent with narcotics deliveries, on September 14, September 15, September 23, and on October 1, 2024.

**Information about SP-4, and its Resident's Connections to the DTO**

96.     On July 23, 2024, the GPS device on GOMEZ's Mercedes showed that the Mercedes was located at the Methuen, MA residence investigators believe to be a stash house for the DTO.  A short time later, the GPS device indicated that the vehicle was traveling north towards New Hampshire.

97.     At approximately 9:53 pm, GOMEZ's Mercedes arrived in the parking lot of a restaurant in Rollinsford, NH and parked.  Investigators observed a male exit a separate black Mercedes in the parking lot and walk towards GOMEZ's vehicle and get into the passenger side seat.

98.     A New Hampshire Vehicle Registration check showed that the black Mercedes belonged to Redondo DORE with an address of 205 High Street, Apartment #1, Berlin, NH (**SP-4**). Through physical surveillance, law enforcement officers subsequently observed him at the residence coming and going, and at various times of the day and night, consistent with his

27

residing there.[3]  DORE was later identified as the driver of the vehicle during a stop of his vehicle that occurred shortly thereafter (described below).

99.     DORE remained in GOMEZ's vehicle parked at the Rollinsford restaurant for approximately 45 minutes. DORE then exited GOMEZ's vehicle and walked back to his vehicle. Moments later, DORE walked into the restaurant for approximately eight minutes.

100.    When DORE exited the restaurant, he was accompanied by a female later identified (during the motor vehicle stop described below) to be Kelly LACOURSE. Both subjects got into DORE's vehicle, with DORE in the driver's seat and LACOURSE in the passenger seat, and exited the parking lot.

101.    A short time later, the New Hampshire State Police Mobile Enforcement Team (NHSP-MET) conducted a traffic stop on DORE's vehicle.  During the course of the traffic stop, a NHSP-MET trooper spoke with DORE and LACOURSE.  After speaking with both DORE and LACOURSE, NHSP-MET seized DORE's vehicle on the suspicion of narcotic activity.  At the conclusion of the vehicle stop, LACOURSE was arrested on an outstanding warrant, and DORE was released from the scene. DORE's vehicle was towed to a secure location pending a state of New Hampshire Search warrant for the vehicle.

102.    On July 25, 2024, a NHSP trooper applied for and was granted a State of New Hampshire Search Warrant for DORE's vehicle.  A subsequent search of DORE's vehicle yielded vacuum sealed bags containing what laboratory analysis later confirmed to be

---

[3] Law enforcement saw DORE as recently as October 9, 2024, at approximately 2:22 pm, exit the rear of **SP-4** and clean the leaves off his Mercedes and depart the area, returning and reentering **SP-4** later in the day.

approximately 3.88 pounds of methamphetamine as well as 20.97 grams of cocaine, and three (3) cellular phones.

103.    On July 25, 2024, an NHSP trooper applied for and was granted a State of New Hampshire warrant to search the three (3) cellular phones seized from DORE's vehicle. The cellular phones were sent to the Strafford County Sheriff's Office for analysis.

104.    Analysis of the phones indicated that one of the was used by DORE. Toll analysis revealed that MARTINEZ and the number assigned to DORE's phone were in contact 132 times between May 17, 2024, to August 4, 2024.

105.    A search of MARTINEZ's TextNow communications showed communications about drug transactions between MARTINEZ and DORE.  For example, on May 17, 2024, MARTINEZ stated to DORE, "u can head down".  DORE responded, "Ok cool I stated [sic] heading down in so I'll hyu when I'm close". I know from training and experience that "hyu" is a slang abbreviation meaning "hit you up" (contact).  MARTINEZ responded, "my brother safe trip", "i added extra to cover the half half [sic] pound of ice".  From my training and experience, I know that "ice" is a slang term for methamphetamine.  Another communication between MARTINEZ and DORE also references picking up "ice."

106.    Furthermore, a recorded phone call involving LACOURSE indicates that **SP-4** is being used to store narcotics.  During a recorded conversation with an inmate at the Coos County Department of Corrections on August 15, 2024, LACOURSE stated that every time she "re-ups" at DORE's, which included that morning, she falls asleep.  I know from my training and experience that "re-ups" refers to being re-supplied with narcotics, which suggests that narcotics are present at DORE's residence (**SP-4**).

107.    A warrant-authorized search of phones belonging to ARIAS, the runner for the MARTINEZ DTO whose phones were seized during the September 4, 2024 motor vehicle stop previously described, yielded Signal messages showing she would travel to **SP-4**.  On August 1, 2024, at approximately 1:13 am., ARIAS messaged MARTINEZ in Spanish, "Yo estoy aqui donde la M". Through translation, it appears that ARIAS stated that, "I am here where the M". MARTINEZ ultimately responded by providing ARIAS with the address of **SP-4**.

108.    Furthermore, on September 4, 2024, at approximately 10:08 pm, MARTINEZ sent ARIAS a message stating, "205 high Street Berlin NH" (the address of **SP-4**).  ARIAS responded in English, "2 hour and 50 min."  Investigators believe that ARIAS was responding with the amount of time it would take her to arrive at **SP-4**. This is consistent with how long it would take to drive from the Lawrence/Methuen, Massachusetts, area to Berlin, New Hampshire. That same day, less than 30 minutes later, MET-NHSP conducted the motor vehicle stop of ARIAS's vehicle as she was heading north on I-93. During the course of the traffic stop, a NHSP-MET trooper spoke with ARIAS, and she stated she was traveling to Berlin, NH (the town in which **SP-4** is located) to meet a friend for the night.  Subsequently, execution of a state search warrant revealed what laboratory analysis later confirmed to be 1,730.78 grams of methamphetamine and 497.17 grams of cocaine secreted within heat-sealed bags inside ARIAS's vehicle.

109.    ARIAS's travels to **SP-4** are further confirmed by GPS tracking of her phone. Upon a review of the GPS cellular data for one of ARIAS's phones seized during the September 4, 2024 car stop, investigators observed that on two separate occasions the ping data indicated that the cellular device traveled from a residence in Methuen, Massachusetts believed to be a stash house to the area of Berlin, NH, the town where DORE resides at **SP-4**.

110.    Given ARIAS's traveling to Berlin, to the address of **SP-4** provided by MARTINEZ, with large quantities of methamphetamine and cocaine in her car, as well as the prior car stop that occurred just after DORE met with GOMEZ in which a large quantity of methamphetamine and 20.97 grams of cocaine was seized from DORE's vehicle, and the communications between DORE and the MARTINEZ DTO, combined with the fact that ARIAS was communicating with MARTINEZ and not DORE about DORE's address (indicating she may not have a relationship with DORE), and did not travel to **SP-4** for any other purpose known to investigators other than to deliver drugs, there is probable cause to believe that ARIAS's trips to **SP-4** were for the purpose of conducting drug transactions there, and that evidence of narcotics distribution, as described in Attachment B-4, will be found inside **SP-4**.  Textnow communications between DORE and MARTINEZ further provides probable cause that evidence of drug distribution activity will be found on DORE's phone.

**TRAINING AND EXPERIENCE SUPPORTING PROBABLE CAUSE THAT THE ITEMS TO BE SEIZED WILL BE FOUND ON THE SUBJECT PREMISES**

111.    Based upon my training and experience, as well as the collective knowledge and experience of other agents and law enforcement officers, I am aware that drug traffickers very often store controlled substances and tools of the drug trade in their homes, automobiles, garages or outbuildings on their properties, basements, or other places under their immediate control.  I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other locations they access with frequency.

112.     Based on my training and experience, powder drugs such as fentanyl and cocaine are generally brought into the region in bulk.  However, such drugs are not typically consumed by users in such high purity form.  Rather, such powder drugs, when ultimately consumed by the user, are at a lower purity level.  High purity powder drugs are reduced in purity by the addition of dilutants.  This process is called "cutting" or "stepping on" the drug.  Other equipment, such as scales, presses, grinders, razor blades, glass panes, blenders, and mirrors, and the like are typically used in this cutting process.  Once the drug has been "cut," a usual practice is to repackage or "press" it in smaller quantities such as ten-gram fingers or other types of plastic bags for redistribution.

113.     It is generally a common practice for drug traffickers to maintain in hard copy or on electronic devices, records relating to their drug trafficking activities.  Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.

114.     Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions.  There are many reasons why an individual will generally maintain records for long periods of time.  One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes,

32

packaging materials, computer hardware and software).  Second, the individual may no longer

realize he/she still possesses the records or may believe law enforcement could not obtain a

search warrant to seize the evidence.  Lastly, it is common for individuals to set aside or store

such records, and because they generally have no immediate need for the records, they are often

forgotten.  To law enforcement, however, all these items may have significance and relevance

when considered in light of other evidence.

      115.    Additionally, drug traffickers must maintain telephone and address listings of

clients and suppliers and keep them immediately available in order to efficiently conduct their

drug trafficking business.  Drug traffickers may also keep lists of customers, the cars they drive,

and the phones they use in order to keep track of them.  They may also collect court papers and

other documents about customers who they believe may be cooperating with law enforcement

authorities in order to protect themselves or attempt to intimidate potential cooperators.

      116.    It also is a generally common practice for traffickers to conceal at their

residences, or other places they access frequently, large sums of money, either the proceeds from

drug sales or monies to be used to purchase controlled substances.  Individuals who distribute

controlled substances often use cash or readily transported assets which are used as cash

equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because

of the illegal nature of the transactions and to lessen the possibility of a financial paper trail.

Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money

orders to pay for controlled substances.  They may also use banks and wire companies, both

foreign or domestic, to launder and transfer funds to co-conspirators.  They may also use

shipping companies and keep records of shipments of goods bought with drug proceeds.

Records relating to income and expenditures of money and wealth in connection with drug

trafficking would also typically be maintained in residences.  I know that drug traffickers

sometimes purchase real estate with suspected drug proceeds.  They may keep records of real

estate transactions, money received from rental properties, and other such documents in their

residences.

117.    Based on my training and experience, I know that individuals involved in the

distribution of controlled substances attempt to hide evidence of their residence being used in

connection with drug activity and, further, employ methods of surveillance at such residence in

order to evade law enforcement.  Typically, these individuals will maintain at their residence

documents relating to the identity of the person(s) in residence, occupancy, control, or ownership

of the residence.  Such identification evidence is typical of the articles people commonly

maintain in their residences, such as canceled mail, deeds, leases, rental agreements,

photographs, personal telephone books, diaries, utility and telephone bills, statements,

identification documents, and keys.  I know that drug traffickers often use storage units to store

drug proceeds and that keys or records of these units may be kept in residences.

118.    Based on my training and experience, I know that drug traffickers typically use

cellular telephones in order to facilitate drug transactions, including to order and take orders for

controlled substances or to set up shipments.  I am aware that items such as cell phones are often

located in a residence or on an individual's person.

119.    Individuals involved in the illicit distribution of controlled substances often take

or cause to be taken photographs of themselves, their associates, their property and their product

and such items are usually maintained within their residence and sometimes on cell phones.

120.    It is common for individuals who are involved in the trafficking and distribution

of controlled substances to store the records of those activities and proceeds of those activities in

secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

121.    I know that individuals who distribute narcotics often utilize motor vehicles in order to obtain quantities of controlled substances from their source of supply for distribution.  I also know that individuals who are engaged in the distribution of controlled substances utilize motor vehicles in order to transport controlled substances to various locations in order to meet with and distribute controlled substances to potential drug purchasers.

122.    In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences.   It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones.  I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

123.    As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  Actions such as

35

internet searching or emailing (in addition to calling) and text messaging can now be performed

from most cell phones.  I know, based on my training and experience, that drug traffickers may

use encrypted chat platforms like Whatsapp, Textnow, Facebook Messenger, and Instagram, to

communicate with people in other countries (often countries from where drugs are brought into

the United States) and with people who are most cautious about law enforcement detection.

Other applications like Venmo or Cashapp allow people to quickly make financial transfers to

others and drug customers may use these methods to pay their sources of supply for drugs.

124.    In addition, those involved in drug trafficking crimes commonly communicate

using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones

is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular

numbers dialed by particular cellular telephones can be evidence of drug trafficking.  Such

numbers can confirm identities of particular speakers and the occurrence of certain events.

Based on my training, experience, and information provided by other law enforcement officers, I

know that many smartphones can now function essentially as small computers.  Smartphones

have capabilities that include serving as a wireless telephone, digital camera, portable media

player, GPS navigation device, sending and receiving text messages and e-mails, and storing a

vast range and amount of electronic data.  Examining data stored on devices of this type can

uncover, among other things, evidence that reveals or suggests who possessed or used the device.

125.    As with most electronic/digital technology items, communications made from an

electronic device, such as a computer or a cell phone, are often saved or stored on the device.

126.    Law enforcement officers and agents executing this warrant will endeavor to

search for and seize only the phones which, upon reasonable inspection and/or investigation

conducted during the execution of the search, are reasonably believed to contain the evidence in

Attachment B-1, B-2, B-3, and B-4, respectively, because they appear to be associated with (that is, used by or belong to) individuals named in Attachments B-1, B-2, B-3, and B-4, respectively.

127.    As described in Attachments B-1, B-2, B-3, and B-4 this application seeks permission to search for records that might be found in the SUBJECT PREMISES in whatever form they are found. One form in which the records might be found is data stored on a cellular phone. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

128.    *Forensic evidence*. As further described in Attachments B-1, B-2, B-3, and B-4, this application seeks permission to locate not only electronic files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how cell phones were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on the storage medium (in this case cell phones) at issue because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times

37

the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.

38

Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions

39

about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

129.   *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in

order to determine whether it is evidence described by the warrant.

### AUTHORIZATION TO USE BIOMETRIC FEATURES TO UNLOCK DEVICES

130.    The warrant I am applying for would permit law enforcement to obtain from

certain individuals the display of physical biometric characteristics (such as fingerprint,

thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure

pursuant to this warrant.

131.    I know from my training and experience, as well as from information found in

publicly available materials published by device manufacturers, that many electronic devices,

particularly newer mobile devices and laptops, offer their users the ability to unlock the device

through biometric features in lieu of a numeric or alphanumeric passcode or password. These

biometric features include fingerprint scanners and facial recognition features. Some devices

offer a combination of these biometric features, and the user of such devices can select which

features they would like to utilize.

132.    If a device is equipped with a fingerprint scanner, a user may enable the ability to

unlock the device through his or her fingerprints. For example, Apple offers a feature called

"Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once

a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the

device's Touch ID sensor, which is found in the round button (often referred to as the "home"

button) located at the bottom center of the front of the device. The fingerprint sensors found on

devices produced by other manufacturers have different names but operate similarly to Touch

ID.

41

133.   If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

134.   In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

135.   As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

136.   I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This

42

can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time.

137.    For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

138.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found in the subject Target Vehicle and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

139.    Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement

43

personnel to (1) press or swipe the fingers (including thumbs) of BONNER and GRANT at SP-1, the O'BRIENS at SP-2, MCKENZIE at SP-3, and DORE at SP-4and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

### CONCLUSION

140.    For all the reasons described above, I submit that there is probable cause to believe that evidence, instrumentalities, and fruits of the violations of the Target Offenses, further described in (a) Attachment B-1, will be found by searching the SUBJECT PREMISES described in Attachment A-1, (b) Attachment B-2, will be found by searching the SUBJECT PREMISES, as described in Attachment A-2, (c) Attachment B-3, will be found by searching the SUBJECT PREMISES, as described in Attachment A-3, and (d) Attachment B-4, will be found by searching the SUBJECT PREMISES, as described in Attachment A-4.


/s/ John Forbes
Task Force Officer John Forbes
U.S. Department of Homeland Security
Homeland Security Investigations


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. P. 41 and affirmed under oath the contents of this affidavit and application.


_____
United States Magistrate Judge